# IN THE TAX COURT OF THE STATE OF OREGON

## ROSEBURG FOREST PRODUCTS COMPANY
and Allyn C. Ford, Trustee

*v.*

## DEPARTMENT OF REVENUE

(TC 4082)

David L. Canary, Garvey, Schubert & Barer, Portland represented Plaintiffs (taxpayers).

Marilyn J. Harbur, Assistant Attorney General, Department of Justice, Salem, represented Intervenor (department).

Decision for Defendant rendered November 4, 1998.

**CARL N. BYERS, Judge.**

Plaintiffs appeal the 1990-91 assessed value of a large integrated wood products manufacturing complex in Dillard, Oregon. Plaintiffs elected under ORS 308.411[1] to deny Defendant access to their income and expense records and to have the property assessed without use of the income approach or consideration of functional or economic obsolescence. This election presents unique appraisal challenges because the value estimate may be higher than real market value due to the presence of functional or economic obsolescence.

## FACTS

The wood products complex began in 1946 as a small sawmill owned and operated by a talented and hardworking man. In 1949 he added a power plant with one boiler. In 1951 he added a second boiler, and in 1952 he added a plywood plant with a veneer capacity of 283,000,0000 square feet annually.[2] In 1955 and 1956 a third boiler and two generators were added to the power plant. A second plywood plant with a capacity of 408,000,000 square feet was also added. In 1962 the log-barking facility was established, and in 1965 a particle board plant was added. The particle board plant was expanded in 1972, creating an annual capacity of 309,525,000 square feet.[3] In 1966 a stud mill with a capacity of 128,000,000 board feet (BF) per year was added, and in 1972 a planing mill and sorter were added. In 1973 and 1974 the pre-finish and melamine plant was added, and in 1977

---

[1] All references to the Oregon Revised Statutes are to 1989.

[2] Plywood capacity is measured on a three-eighths inch basis and is indicative of the maximum possible output, not actual production.

[3] Particle board is measured on a three-quarters inch basis.

the original 1946 saw mill was replaced with two large log headrigs and two small log headrigs, creating a total sawmill capacity of 248,000,000 BF per year.

The complex includes other facilities such as dry kilns, storage areas, and offices. Although much of the plant is old, it is a completely integrated facility where nothing is wasted. Scraps, chips, and sawdust are used to make particle board. Barkdust and other fiber are used as hog fuel to power the cogeneration plant. While resource-efficient, integration requires a large number of conveyors, blowers, and other equipment to move the materials around the plant.

It should be noted that the value of the land is not at issue, only the value of the buildings, structures, machinery, and equipment.

## APPRAISAL HISTORY

As indicated, Plaintiffs elected to have the facility assessed under ORS 308.411(2), which provides:

> "The owner of a plant may elect to have the plant appraised and valued for ad valorem tax purposes excluding the income approach to valuation and excluding taking into consideration functional and economic obsolescence in the utilization of any approach to valuation."

Defendant (department) sent an appraisal team to the facility in late 1989 to perform an appraisal under the statute. That team went through the plant, listing all of the assets and estimating their reproduction costs new, including freight and installation. They then estimated the amount of physical depreciation. The department's appraisal team appraised the improvements at an "elected" value of $125,779,700.

Plaintiffs appealed that value to the department. The department conducted a hearing but delayed the decision approximately four years awaiting a court ruling on another appeal concerning the interpretation and application of ORS 308.411. Eventually the department issued its decision sustaining the assessed value and Plaintiffs appealed to this court.

Due to the passage of time, the department's original appraisers were no longer available to defend their appraisal at trial. However, the department had other appraisers who had appraised the plant in 1995 for the July 1, 1996, assessment date. It assigned those appraisers to defend the 1990 assessed value.

The department's new appraisers decided that the 1990 appraisal contained too many errors and could not be defended. Also, the 1990 appraisal was based in some instances upon used equipment prices, which later case law held was not appropriate. Faced with this dilemma, the department's appraisers decided to use their 1996 appraisal as the basic appraisal starting point. However, that appraisal was a real market value appraisal.[4] The department's appraisers therefore had to make adjustments to conform to the constraints of ORS 308.411 as well as adjust their 1996 costs back to 1990. The appraisers also faced other problems such as changes in the property between 1990 and 1996 due to replacement and major repairs or rebuilds.

## APPRAISAL PARAMETERS

■    A taxpayer who makes the election under ORS 308.411 obtains the benefit of maintaining the confidentiality of its income and expense information. However, it does so at the expense of placing constraints upon the appraiser's consideration of market factors. By excluding use of the income approach to valuation, the appraiser is limited to the cost and sales comparison approaches. Also, in using those approaches, the appraiser must exclude consideration of functional or economic obsolescence. If market data used in those approaches reflects obsolescence, adjustments must be made.

"Even if the sale price of a comparable property does reflect obsolescence, it may be possible for an appraiser to

---

[4] Due to the enactment of Article XI, section 11b, of the Oregon Constitution (Measure 5), in November 1990, the concept of real market value replaced true cash value.

use evidence of the comparable sale in its assessment without giving any weight to functional or economic obsolescence in the subject property." *J.R. Simplot Co. v. Dept. of Rev.*, 321 Or 253, 264, 897 P2d 316 (1995).

## PLAINTIFFS' EVIDENCE

Plaintiffs' appraisers were both very experienced and very knowledgeable. One appraiser used the cost approach and the other used a sales comparison approach. Neither appraiser was present at the plant in 1990.

### Cost Approach

Ron Ulrich, who prepared the cost approach, testified that he used the department's 1990 appraisal as the starting point for his estimate of reproduction cost new. After reviewing it, he found that it seemed reasonably accurate, although he did not verify it. He did talk with plant personnel about the property that was there in 1990 and about its condition. Based on his review and discussions with plant personnel, and using his own experience and personal knowledge of costs, he adopted the department's 1990 estimated reproduction cost new of $278,629,110.

Knowing that he could not consider functional or economic obsolescence, Ulrich used the physical age-life method to estimate physical depreciation. This method requires the appraiser to estimate both: (1) the effective age[5] of the property based on observed conditions, plant records, and discussions with plant employees; and (2) the total expected physical life of the property. The ratio between the effective age of the property and its total physical life expectancy is applied to the reproduction cost new to obtain an estimate of value.

Various circumstances at the plant made this process particularly challenging. Additions and rebuilds, both in the buildings and structures and in the machinery and equipment, made it difficult to estimate a single effective age or a single total physical life expectancy. For example, additions to the barker building, which was built in 1962, were made in

---

[5] Ulrich used the term "actual age" to refer to the effective age in his appraisal report.

1969 and 1971. Consequently, Ulrich used a blended estimate to determine actual age. He estimated total physical life based on his 27 years of experience and on his discussions with plant personnel. He also considered other sources of information such as the Internal Revenue Service depreciation tables and appraisal service publications such as *Marshall and Swift.*

Because Ulrich was not in the plant in 1990, he could not rely upon his own observations of plant conditions. Consequently, in estimating the condition of the property, he relied solely upon discussions with plant personnel. Applying the method indicated, Ulrich found physical depreciation of $197,577,502, resulting in an estimated "elected" value of $81,051,608.

Ulrich used a second method to estimate physical depreciation. Based on his study of the wood products industry, he concluded that there was no economic obsolescence in the industry just prior to 1990. He testified that that was just prior to the economic consequences of the environmental restrictions commonly attributed to the northern spotted owl. Therefore, he selected sales that took place between 1988 and 1990. He then calculated the ratio between the sale price and the reproduction cost new of each sale. These calculations indicated that similar wood products plants sold for prices ranging from 11.14 percent to 19.44 percent of reproduction cost new.

Ulrich recognized that while these sales would not reflect economic obsolescence, they would reflect any functional obsolescence. Accordingly, he made adjustments to "restore" functional obsolescence to these comparable sales. These adjustments were based on his judgment and the judgment of other appraisers in his office. After making the adjustments, Ulrich estimated the subject plant at an overall rate of 24 percent good, or 76 percent physically depreciated. This resulted in an estimated value of $66,870,986, about $15,000,000 less than he arrived at under the age-life method. In reconciling the two estimates of physical depreciation, Ulrich gave greater weight to the age-life method and concluded that the elected value of the subject property as of January 1, 1990 was $75,000,000.

*Sales Comparison Approach*

Larry Tapanen testified for Plaintiffs using the sales comparison approach. He found sales of six saw mills and four plywood plants which he believed were sufficiently comparable to the subject plant. However, he was unable to find any sales of particle board plants.

Recognizing that sales often include other assets such as land, timber, or personal property, Tapanen accepted the allocations of the purchase prices by the parties to the sales. He believed that was reasonable in view of the IRS scrutiny and accounting conventions requiring fair market allocations for income tax purposes.

Tapanen made adjustments to the sales based on the market and his judgment with regard to technology and other features. He determined a price per capacity and found the closest comparable plants to the subject. Applying those plants' indications of value, he found that the sawmill sales indicated a value of $21 per BF per shift and that plywood plant sales indicated a value of $22 per square foot per shift. Using these figures and others, he estimated a value for the subject plant of $55,000,000. However, because the sales comparison approach was given virtually no weight in the reconciliation process by Plaintiffs, the court will not extend this Opinion by further discussing it.

## DEFENDANT'S EVIDENCE

*Cost Approach*

As indicated, the department's appraisal was based on a 1995 detailed listing of the buildings and structures and machinery and equipment; including wiring, foundations, and structural supports. However, that appraisal was seeking a real market value as of July 1, 1996. In order to adjust the appraisal to the January 1, 1990, appraisal date, the appraisers had to make a number of adjustments, including adjustments to remove any technological improvements that occurred since 1990. That was complicated by the fact that some of the equipment was so old that it was no longer being manufactured. Also, the appraisers had to adjust for items that were not there in 1990 and add-back items that had been

removed after 1990. The appraisers recognized "some unmeasurable functional and economic obsolescence that has not been removed." The appraisers arrived at an estimated reproduction cost new for January 1, 1990, of $320,284,000.

In estimating physical depreciation, the department's appraisers considered Plaintiffs' maintenance policy and talked with plant personnel about the condition of the property in 1990. However, the appraisers appear to have relied primarily upon their discussions with equipment manufacturers and dealers in estimating the useful life of the equipment. Based on these discussions, the appraisers developed depreciation tables which estimated either a 25 or 30 year useful life with a 10 percent or 20 percent minimum. They then applied physical depreciation on a straight-line basis. Using this method, they estimated physical depreciation of $186,928,000, resulting in an estimated value for the subject plant of $133,356,000.

*Sales Comparison Approach*

The department's appraisers conducted market research and concluded that mill purchasers first looked to available timber supply, then evaluated the equipment, estimated its salvage value, and performed a discounted cash-flow analysis. Because of the ORS 308.411 election, and the age and make-up of the integrated facility at Dillard, the department's appraisers believed there were too many unique assets to make reliable adjustments. They also believed the necessary adjustments would be too large and too numerous to allow reasonable use of the sales comparison approach. Thus, they did not consider it in their reconciliation.

## ANALYSIS

Due to the age of the equipment, neither party was able to use a pure reproduction cost new. As a result, they had to distill costs from other prices in the market, both new and used. The court believes that the data obtained from the market in 1989 for the January 1, 1990, appraisal would be more relevant and accurate than data obtained in 1995-96. While there are numerous, sometimes irreconcilable, errors

in both property listings, the court finds the evidence concerning the 1990 appraisal more persuasive and that $278,629,110 is the most probable reproduction cost new as of January 1, 1990. This estimate was established by some of the department's most experienced appraisers who were on-site close to the assessment date. They used a "board-and-nail" approach, which should have resulted in a fairly accurate number. Moreover, they appraised the property knowing that the ORS 308.411 election was in effect. As Plaintiffs point out, they certainly would not be biased in favor of the taxpayer.

By comparison, the department's current appraisers made their appraisal for a July 1, 1996, date. They were presented with the complicated and extraordinary task of adjusting a real market value appraisal back six years to an ORS 308.411 appraisal. A number of changes had been made in the intervening years, including the addition of a $1,500,000 dryer. In addition, the appraisers used a commercial service for estimating cost that assumed steel buildings when the subject buildings are mostly wood. Having to adjust their 1996 appraisal back to 1990 was undoubtedly part of the explanation for the large number of errors disclosed.

The court finds it difficult to believe that the department's most experienced appraisers in 1990 erred in their estimate of reproduction cost new by approximately $40,000,000. It is more likely that the department's current appraisers were unable to make all of the adjustments for time and technology, particularly where many of the major pieces of equipment represent replacement cost new.

■■ Having determined the reproduction cost new, the court must now determine which appraisal most accurately estimates physical depreciation. The court heard substantial testimony indicating that Plaintiffs' management abhors breakdowns or "downtime." Accordingly, Plaintiffs perform "extraordinary maintenance" on their machinery and equipment. That suggests that the equipment at any one point in time should be in good, if not excellent physical condition. If ordinary maintenance involves lubrication and the replacement of bearings or minor-wearing parts, then extraordinary maintenance must involve the replacement of a motor or

major-wearing parts. If a piece of equipment is rebuilt or overhauled, then its useful physical life is restored or lengthened. While an appraiser cannot assume that Plaintiffs will continue their policy of extraordinary maintenance in the future, as of the assessment date, the physical condition of the property should be better than average.

Ulrich's view was not consistent with this evidence. For example, he estimated that the log barker and merchandiser had an actual age of 15 years and an effective age of 13 years, with only two years remaining life. It is not clear from his testimony whether his estimate of total physical life was 15 years or 20 years. However, in any case, if the machinery is extraordinarily maintained, then the effective age should be less than 13 years. Otherwise, one must conclude that either the normal life expectancy is much less than 15 years or that the Plaintiffs do not perform extraordinary maintenance.

Ulrich's estimates of physical depreciation are greater than those of the department's original appraisers who examined the property in 1990. Yunker, one of those appraisers, testified for Plaintiffs that he observed the property's condition and did a good job. His estimate of physical depreciation in the log barker and merchandiser was 55 percent while Ulrich estimated it at 86 percent. As noted above, Ulrich was not present in 1990, rather he relied solely upon the impressions of plant personnel. As such, his opinion as to the condition of the subject property in 1990 is not as persuasive as that of the previous appraisers.

Ulrich's sales price/RCN ratio is also not persuasive as an indicator of physical depreciation. Although there appears to be a strong statistical correlation between the two factors, the court can give little weight to it. This conclusion is reached primarily because the comparable sales were not in fact very comparable. None of them included a particle board plant, which constitutes about 1/3 of the total reproduction cost new of the subject property. Likewise, the subjective judgments required to adjust for functional obsolescence seem too unfettered by facts. Ulrich admitted that it required a "leap of faith" to believe the estimate of 24 percent good was valid.

The court is not persuaded that the subject suffers from 70 percent physical depreciation overall. If it did, then the remaining 30 percent would have to represent all functional and economic obsolescence *and* any market or cash value. If one used Plaintiffs' ratio of sales price to reproduction cost new, then the market value should be 15 percent of RCN. This leaves only 15 percent for functional obsolescence, yet Ulrich testified that in the large log mill:

> "The equipment is—very large and massive but it is older technology and just watching it operate it's very slow and inefficient * * *."

He pointed out that: (1) The Stud Mill was very old and had layout problems. (2) The particle board plant was one of the oldest plants still operating. (3) While the plywood plants had some modern equipment, for the most part they are 1952-56 vintage and are some of the older plants out there. (4) With regard to the whole facility, it is "much older and there were a number of buildings and structures and, * * * processes that, * * * were pretty old and * * * worn out * * *."

In addition to old equipment, there are layout problems, which constitute a form of functional obsolescence in the subject plant. In its sales price/RCN approach, Plaintiffs adjusted the Omak Mill sale 25 percent for functional obsolescence and the Fort Hill Mill 30 percent for functional obsolescence. This suggests that the subject property would be at least 30 to 40 percent functionally obsolete. If that is the case, then it would have zero market value under Ulrich's approach.

■ Plaintiffs criticized the department's use of a straight-line depreciation approach because it "lacks judgment." A straight-line depreciation approach may be appropriate when considering all forms of depreciation.

> "The overall age-life method provides a direct estimate of depreciation of the subject property. Borrowed from accounting, the method is based on straight-line depreciation, in which the building is assumed to depreciate by a constant percentage each year over its *economic life*." The International Association of Assessing Officers, *Property Appraisal and Assessment Administration*, at 224 (1990 ed). (Emphasis added.)

However, logic indicates that where the appraiser is estimating only physical depreciation, a more specific approach is called for. This is especially true where there has been extraordinary maintenance, making the level of deterioration uneven and extending the normal life span. Also, the department's appraisers testified that they obtained their estimates of normal life based on manufacturers' and dealers' input. Certainly the input of manufacturers and dealers must be colored by economic considerations as well as physical condition. It also appears that their comments are based more on generalities as to types of equipment rather than specific manufacturers.

The department's appraisers chose the straight-line depreciation approach because they had "little information" about Plaintiffs' maintenance policy. Although the appraisers recognized that physical depreciation is not really straight line due to changes and replacements, they did not know which parts had been removed or replaced. Finally, the department's appraisers applied their estimates of straight-line depreciation to their estimated reproduction cost new. For these reasons, and because the court has rejected their estimated reproduction cost new, their estimate of physical depreciation can be given little weight.

In summary, the court finds that Plaintiffs have failed to carry their burden of proof. They have failed to establish that the value of the plant, considering physical depreciation only, is less than the assessed value. Accordingly, the court finds that the value required by ORS 308.411 as of January 1, 1990, is $125,387,490.

As this court has previously noted, when dealing with older plants suffering from functional obsolescence, determinations under ORS 308.411 do not represent market value. In fact, the evidence in this case indicates that the cash value of the subject property as of January 1, 1990, was substantially less than the value determined under ORS 308.411. Costs to neither party.